DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**NOUMAN KHAN RAJA,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-1210

[April 28, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Joseph George Marx, Judge; L.T. Case No. 2016CF005507AXX.

Steven H. Malone of Steven H. Malone, P.A., West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, Melynda L. Melear, Senior Assistant Attorney General, West Palm Beach, and Matthew Steven Ocksrider, Assistant Attorney General, West Palm Beach, for appellee.

MAY, J.

In this tragic case, the defendant, a former police officer, appeals his conviction and sentence for manslaughter by culpable negligence and attempted first degree murder for the fatal shooting of the victim. The defendant raises twelve issues. Having reviewed the record, we find no error. We write to address the double jeopardy, merger, and single homicide rule issues raised, and affirm on the remaining issues without further comment.

### *The Shooting*

The victim's car broke down on the offramp of I-95 at PGA Boulevard while he was on his way home from performing with his band. The victim had a registered firearm inside a case on the passenger seat of his car. The victim, a friend who came to the scene, and a Road Ranger were unable to fix the car. The victim then called his brother, who offered to come help or call a tow service, but the victim did not want to leave his drums in the

car unattended.

Around 3:15 a.m., the victim called AT&T Roadside Assistance to arrange for a tow truck. The call was recorded. As the victim provided information to the AT&T Roadside Assistance operator, the defendant pulled up in front of the victim's car in an unmarked van.

The defendant was on-duty that night, but was dressed in plain clothes without anything identifying him as law enforcement.[1] The defendant was headed to a nightclub in response to a radio callout when he first saw the victim's car. He initially thought the car was abandoned. The defendant called over the radio to advise there was an abandoned or possibly disabled vehicle on the side of the road.

The defendant pulled over to investigate and determine whether the vehicle needed to be towed. In hindsight, the defendant was "kicking himself" for pulling in front of the vehicle because it violated law enforcement's "golden rule." Had he known the vehicle was occupied, he would never have put himself "in a fatal funnel position like this by pulling in front of it."

While the defendant investigated the vehicle, he was not wearing his duty gun or vest. He had his department-approved backup gun in a waistband holster inside with his shirt tucked in.

According to the defendant's sworn walkthrough statement, as he got close to the vehicle, the door swung open, and the victim jumped out. The victim then said, "I'm okay, I'm okay, man," at which point the defendant said, "Hey, man, police, can I help you?" When the defendant said "police," the victim "jumped back."

The defendant remembered the victim drawing a gun at him that he "swear[s]" had a LaserMax laser and guide rod on it. When the defendant saw the red light flashing at him, he shouted, "Drop the gun." The victim did not drop the gun. The defendant then pulled the trigger two to three times and the victim started running.

The defendant had his cell phone on him and dialed 911 because he

---

[1] In his sworn statement, the defendant explained that he is supposed to call a marked unit to give his position if he sees anything suspicious. When the marked unit arrives, "I'll throw my vest on if I need to and . . . then go ahead and make contact. . . ." While in street clothes, he does "not do any takedowns." If there's an emergency, "I have the vest and everything identifying on me."

2

had left his radio in the van.  The "whole time," the defendant was:

> giving commands, . . . yelling and screaming.  I'm like 'Drop the gun, drop the gun, drop the gun.'  And as he's running, he gets about like right—just a little past where the guardrail starts, and he's he does this number, and I see his whole body spin, and I saw like a flash, a silver flash, it was like a metallic flash come at me, and in my head, I immediately [] said, aim, aim, aim, and I was like, aim, . . . and I picked that front sight, right in the center mass, and I just pulled the trigger three times, and I saw him drop, and I saw something silver fall, and at this point I was still on the phone with dispatch.

The transcript of the AT&T Roadside Assistance operator, who had remained on the call with the defendant, reflected a very different version of what happened:

> **Operator**:  Okay.  Is there any – hold on let me write southbound down.  [Are] there any buildings, landmarks, anything like that that I could use to pinpoint your address?
> *[sounds of car door open bell ringing]*
> *[distant unintelligible talking]*
>
> **Victim**:  [to the defendant outside of the victim's car]  Huh?  I'm good.[2]
>
> **Defendant**:  Really?
>
> **Victim**:  Yeah, I'm good.
>
> **Defendant**:  Really?
>
> **Victim**:  Yeah.
>
> **Defendant**:  Get your f---in' hands up!  Get your f---in' hands up!
>
> **Victim**:  Hold on.  Hold on.
>
> **Defendant**:  Get your f----in' hands up!  Drop.

---

[2] Both the defendant and State agree the victim was responding to something the defendant said.

*[sounds of three gunshots]*

**Operator**:  Oh my gosh!

*[sounds of car door open bell ringing]*

**Defendant**:  [in distance] Drop it!

**Operator**:  Um.

*[sounds of three gunshots]*

**Operator**:  [speaking to someone in background] There's gunshots.

*[sounds of car door open bell ringing continues]*

*[distant unintelligible talking]*

*[sound of car door open bell ringing continues]*

**Defendant**:  [in background]  I'm gonna have to, I mean – [unintelligible].

*[sounds of car door open bell ringing continues]*
*[distant unintelligible talking].*

According to the AT&T Roadside Assistance operator, the entire recording occurred over the course of approximately three minutes.

Two guests staying at a nearby hotel heard the gunshots in sequence—three shots followed by a pause and three more shots.  One guest stepped onto the balcony after the second set of shots and saw a man with a gun "stepping backwards from the area, walking backwards, holding a gun in one hand and his cellphone in another hand."  She did not see anyone else.  The man she saw with a gun was "pretty far away" from the vehicle that she saw parked on the side of the off-ramp.  He had the gun aimed towards the same direction where she later saw a dead body in the grass.  He looked like he was wearing dark pants, a shirt, and a hat; she could not tell he was a police officer.

Thirty-three seconds after the final shot rang out, the Palm Beach Gardens emergency communications operator received a call from the defendant.  The call was also recorded.  The first thing the communications

4

operator heard was the defendant saying, "drop the f---ing gun right now." The defendant then identified himself and stated that he shot a man "at least three, four times" on the off-ramp behind the hotel and that the man was down. In the background, he again stated, "drop the gun."

The defendant then described the man he shot to the communications operator: a "[b]lack male, wearing all black, dreads, had a silver handgun in his right hand." The defendant explained, "I came out, [pause] I saw him come out with a handgun, I gave him commands, I identified myself, and he turned, pointed the gun, at me, he started running, I shot him. [Pause] I've lost contact." The defendant then began to walk back to his vehicle. After getting to his radio, the defendant was told to hang up his phone and he did.

The defendant stated on the radio that he saw the man "drop something, but that's when I started to walk back towards the van;" he lost contact with the man when "[h]e dropped down . . . in this area between the [hotel] and the 95 on ramp [sic]."

A sergeant, who was first to arrive on scene, saw the defendant standing in front of his van near the hood of the victim's vehicle. The defendant wasn't wearing a tactical vest over anything identifying him as a law enforcement officer. The defendant later told the sergeant that he had not worn his tactical vest during the shooting.

The defendant told the sergeant the victim had a gun, he ordered the victim to drop it, the victim "ran north in the grass between the off-ramp and the" hotel, and the defendant saw the victim "throw what he believed was a silver gun" approximately twenty feet to the rear of his vehicle in the grass. With the use of flashlights, the sergeant, the defendant, and other officers found the victim's body lying face down in the grass with his head towards the hotel and arms underneath him. The officers rolled the victim over to ensure there were no other weapons.

The victim was pronounced dead on scene at 3:33 a.m.

### *The Investigation*

When investigating the scene, officers "saw six shell casings that were along the paved portion of the ramp near" the victim's car. The gun the defendant saw the victim throw was found in a location near where the defendant told the sergeant he saw it thrown although it was about seventy feet from the vehicle. Three casings were also noted in the roadway and measurements were taken.

A firearm was discovered in the grass at the base of a pole just off the road. The victim's body was located 124 feet, five inches from the firearm and 205 feet, four inches from his left front tire.

After the shooting, the defendant gave a sworn walkthrough statement detailing the events which was introduced into evidence. Notably, the defendant told investigators the victim held the gun in his right hand. The victim was left-handed.

Investigators discovered the recorded call between the victim and the AT&T Roadside Assistance operator. When they compared the recording and the defendant's sworn statement, discrepancies were obvious.

- First, while the defendant indicated the victim immediately popped out of the vehicle, there was a 6.3 second gap between whatever the defendant first said and the victim's first words.

- Second, all six shots were captured on the recorded call. The first three were fired in "relatively rapid succession." "The second three were a little more spaced out . . . ." And, there was a ten to twelve second delay between the first volley and second volley of shots.

- Third, the defendant told investigators that he was on with 911 during the encounter and shouted commands on the call, but analysts later determined that the 911 call took place thirty-three seconds after the defendant had fired his last shot.

Investigators performed a light reflectivity test and found the red traffic signal light reflected off of the chrome of the victim's firearm, but did not flicker like a LaserMax laser. Investigators were not able to recreate that effect.

The medical examiner performed an autopsy. The medical examiner was board certified in forensic pathology and had performed thousands of autopsies, many involving gunshot wounds. "[A] good percentage[]" of those gunshot wound cases involved people shot through the heart. The medical examiner concluded the victim's death was a homicide caused by a "gunshot wound of chest."

The medical examiner documented that the victim had a gunshot

6

wound to his right and left arms that were inconsistent with a person holding or aiming a gun. The medical examiner opined that had the victim been holding anything in his left hand, he would not have been able to continue holding it after the gunshot.

The victim also sustained a gunshot wound to the chest. That bullet entered from a side angle, which was consistent with a person turning. The bullet entered the victim's chest, went through his right lung, the top portion of his heart, through the left lung, and ended up "in the lateral aspect of his left arm." "[T]he top portion of his heart [was] blown out, blown away."

The medical examiner opined that a person who sustained such an injury would not drop right where he stood, but because of the location and severity of the injuries, would lose blood pressure suddenly. The person would become dizzy and begin to faint. And, she did not believe a person with a similar injury would be able to run 123 feet after sustaining the injury; rather, she believed a person would make it only a few yards before falling.

The State charged the defendant by amended information with manslaughter by culpable negligence while armed (count 1) and attempted first degree murder with a firearm (count 2).

At the close of the State's case, the defendant moved for a judgment of acquittal. He argued among other things that double jeopardy and the merger doctrine precluded both counts from going to the jury. The State responded the defendant's failure to identify himself as a police officer, confrontational approach to the victim, and lack of any suspicious activity on the victim's part was sufficient to prove reckless indifference. The State also argued that double jeopardy and merger did not apply because the *Blockburger*[3] elements test governed, and the issue was premature.

The trial court agreed with the State that the double jeopardy and merger issues would need to be addressed after the verdict was returned. The trial court then denied the motion. The defendant later renewed his motion for judgment of acquittal, which the court denied.

### *The Verdict*

The jury convicted the defendant on both counts. On count two, the jury specifically found the State proved beyond a reasonable doubt that

---

[3] *Blockburger v. United States*, 284 U.S. 299 (1932).

the defendant actually possessed and discharged a firearm, and that in so doing, actually caused great bodily harm or death to the victim.

### *The Sentence*

The trial court entered a final judgment on both counts and sentenced the defendant to twenty-five years on counts one and two to run concurrently with a twenty-five-year mandatory minimum on count two.

Following the sentencing, the defendant filed a motion under Florida Rule of Criminal Procedure 3.800(b), arguing the twenty-five-year mandatory minimum was improper as a matter of law and not supported by the evidence. The trial court concluded the issue was not cognizable under rule 3.800(b), and denied the motion.

### *The Issues*

In his tenth issue, the defendant argues his convictions and sentences constitute double jeopardy, or alternatively, the attempted murder count merged with the manslaughter count "under" the single homicide rule. The State responds the convictions and sentences do not violate double jeopardy, the merger doctrine, or the single homicide rule because the charges had separate essential elements and attempted murder is not a homicide crime.

- ### *Double Jeopardy*

"Determining whether double jeopardy is violated based on undisputed facts is a purely legal determination, so the standard of review is de novo." *Finkley v. State*, 16 So. 3d 329, 329 (Fla. 4th DCA 2009) (quoting *Binns v. State*, 979 So. 2d 439, 441 (Fla. 4th DCA 2008)).

The Double Jeopardy Clause "prohibits subjecting a person to multiple prosecutions, convictions, and punishments for the same criminal offense." *Valdes v. State*, 3 So. 3d 1067, 1069 (Fla. 2009). In reviewing a double jeopardy claim, the threshold inquiry is whether the charges "were based on an act or acts which occurred within the same criminal transaction and/or episode." *Partch v. State*, 43 So. 3d 758, 760 (Fla. 1st DCA 2010).

Our "legislature has codified the double jeopardy bar within section 775.021(4)(a)-(b), Florida Statutes (2015)." *McCullough v. State*, 230 So. 3d 586, 590 (Fla. 2d DCA 2017). The statute's intent is "to convict and sentence for each criminal offense committed in the course of one criminal

episode or transaction and not to allow the principle of lenity . . . to determine legislative intent." § 775.021(4)(b), Fla. Stat.  There are only three exceptions to the legislature's stated intent.  They are:

(1) Offenses which require identical elements of proof;

(2) Offenses which are degrees of the same offense as provided by statute; and

(3) Offenses which are lesser offenses the statutory elements of which are subsumed by the greater offense.

*Id.*

The determination of whether offenses arise out of the same criminal episode is based on whether:  1) there are multiple victims; 2) the offenses occurred in multiple locations; and 3) there has been a "temporal break" between offenses.  *Partch,* 43 So. 3d at 760.  The determination is fact specific.  *See id.* at 760–61.

Here, the defendant was charged with one count of manslaughter under section 782.07, Florida Statutes (2016), and one count of attempted first-degree murder under section 782.04(1)(a)(1), Florida Statutes (2016).  The charging document reflects no temporal break in the shootings.  *See Lee v. State*, 258 So. 3d 1927, 1304 (Fla. 2018) (ruling that a reviewing court should only consider the charging document in a double jeopardy analysis).  The defendant fired six shots, albeit in rounds of three, within seconds of each other.  The two charges arose from the same criminal transaction.

Because the defendant was charged under separate statutes for the same criminal offense, the next step is to apply the *Blockburger* elements test.  *See Jacobs v. State*, 272 So. 3d 838, 840 (Fla. 2d DCA 2019).

The *Blockburger* elements test, codified in section 775.021, provides:

(4)(a) Whoever, in the course of one criminal transaction or episode, commits an act or acts which constitute one or more separate criminal offenses, upon conviction and adjudication of guilt, shall be sentenced separately for each criminal offense; and the sentencing judge may order the sentences to be served concurrently or consecutively. **For the purposes of this subsection, offenses are separate if each offense requires proof of an element that the other does not,**

9

**without regard to the accusatory pleading or the proof adduced at trial**.

§ 775.021(4)(a), Fla. Stat. (emphasis added).

The crime of manslaughter requires, "the killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification." § 782.07, Fla. Stat. In contrast, the crime of attempted first-degree murder requires a person to "attempt to commit [first degree murder]" with the "premeditated design to effect the death of . . . any human being," and commit "any act toward the commission of such offense." §§ 777.04, 782.04(1)(a)(1), Fla. Stat. (2016).

The missing element to the attempted murder charge, death, is essential to the crime of manslaughter. *See, e.g., Brinson v. State*, 18 So. 3d 1075, 1078 (Fla. 2d DCA 2009) ("As charged, the statutory elements of the two offenses with which the State charged [the defendant] do not overlap. The offense of felony murder contains an element—[the victim]'s death—that the offense of attempted second-degree murder does not."). Correspondingly, the crime of manslaughter does not require a premeditated design to effect death. And, neither crime is a lesser offense of the other. The two crimes therefore do not fall within exceptions (1) or (3) of section 775.021(4)(b).

Nor do the two crimes fit within subsection (2)'s exception because they are not degrees of the same offense. While the "homicide statute . . . expressly identifies three degrees of murder, as well as multiple forms of manslaughter," the crime of attempted murder is not a degree of homicide but is its own independent crime. *Partch,* 43 So. 3d at 763; *see also Gridine v. State,* 175 So. 3d 672, 674 (Fla. 2015) ("Long-standing precedent unambiguously instructs that attempted first-degree murder is deemed a nonhomicide offense under Florida law.").

Put simply, the defendant's two convictions did not violate the double jeopardy clause.

- *Merger Doctrine*

The defendant next argues the two crimes merged under the single-homicide rule.

"The merger doctrine is a principle of statutory construction rather than a principle of constitutional law." *State v. Sturdivant,* 94 So. 3d 434, 437 (Fla. 2012). Our supreme court has observed that the merger doctrine was

designed to generally prevent the government from charging felony murder when the underlying felony was assault. *Id.* at 437–38. "The name of the doctrine derived from the characterization of the assault as an offense that 'merged' with the resulting homicide." *Id.* at 437 (quoting *State v. Godsey*, 60 S.W.3d 759, 774 (Tenn. 2001)).

The merger doctrine is not implicated here because neither charge involves felony murder. The elements of each crime cannot merge with one another because one requires the intent to commit premeditated murder without killing the victim and the other does not require intent but does require killing the victim. §§ 777.04, 782.04(1)(a)(1), 782.07, Fla. Stat. The doctrine simply does not apply.

- ***Single Homicide Rule***

The single homicide rule is "a judicially created extension of the constitutional and statutory double jeopardy bar." *McCullough*, 230 So. 3d at 589. "It provides that although a defendant can be charged and convicted under multiple criminal statutes for conduct causing another's death during one criminal episode, that criminal defendant can only be punished once for that death." *Id.*

Recently, our supreme court held the single homicide rule is no longer applicable in Florida due to the legislative amendment of section 775.021, Florida Statutes. *See State v. Maisonet-Maldonado*, 308 So. 3d 63, 70 (Fla. 2020). This renders the defendant's argument moot.

For the foregoing reasons, we affirm the defendant's convictions and sentences.

*Affirmed.*

GERBER and KUNTZ, JJ., concur.

\*          \*          \*

**Not final until disposition of timely filed motion for rehearing.**

11